UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

SPENSER W. BEERMAN,            )
                               )
            Plaintiff,         )
                               )
        v.                     )        Case No. 1:14-cv-393
                               )
CAROLYN W. COLVIN,             )
Acting Commissioner of Social Security,  )
                               )
            Defendant.         )

**OPINION AND ORDER**

This matter is before the court on petition for judicial review of the decision of the

Commissioner filed by the plaintiff, Spenser Beerman, on December 17, 2014.  For the following

reasons, the decision of the Commissioner is **AFFIRMED**.

*Background*

The plaintiff, Spenser Beerman, filed an application for Supplemental Security Income

on July 20, 2011, alleging a disability onset date of April 1, 2010.  (Tr. 16).  The Disability

Determination Bureau denied Beerman's claim on November 18, 2011, and again upon

reconsideration on January 20, 2012.  (Tr. 16).  Beerman subsequently filed a timely request for

a hearing on March 19, 2012.  (Tr. 16).  A hearing was held on April 15, 2013, before

Administrative Law Judge (ALJ) Terry Miller, and the ALJ issued an unfavorable decision on

July 22, 2013.  (Tr. 16–31).  Vocational Expert (VE) Ray O. Burger, Beerman, and Beerman's

mother, Teresa Beerman, testified at the hearing.  (Tr. 16).  The Appeals Council denied review,

making the ALJ's decision the final decision of the Commissioner.  (Tr. 1–6).

At step one of the five step sequential analysis for determining whether an individual is

disabled, the ALJ found that Beerman had not engaged in substantial gainful activity since July

20, 2011, his application date. (Tr. 18). At step two, the ALJ determined that Beerman had the following severe impairments: lumbar and low back pain due to degenerative disc disease, spondylolisthesis, pars defect disorder, and bipolar or mood disorder. (Tr. 18). The ALJ also found that Beerman's history of drug usage and ADHD were non-severe impairments. (Tr. 18–19). Despite finding Beerman less than candid regarding his past drug use, the ALJ stated that Beerman had a history of drug and alcohol use. (Tr. 18). Beerman admitted that he used marijuana but denied using other drugs. (Tr. 18). The ALJ stated that records indicated that Beerman used crack from 2006 to 2007, that he was on house detention after testing positive for marijuana, and that he learned to grow marijuana. (Tr. 18). Beerman denied using marijuana for the past year. (Tr. 18).

At his November 2011 psychological consultative examination, Beerman stated that he experimented with marijuana, mushrooms, and prescription pills over a five-year period. (Tr. 19). However, he indicated that he stopped using illegal drugs except for marijuana three years ago. (Tr. 19). At that time, Beerman was on probation for using and growing marijuana and claimed that he had not used marijuana for six months. (Tr. 19). The ALJ noted that Beerman received substance abuse treatment and that he struggled with recovery. (Tr. 19). He also stated that there was no evidence of psychosis or a significant mood disorder by February 2013. (Tr. 19).

The ALJ also found that Beerman's ADHD was not a severe impairment. (Tr. 19). He indicated that Beerman had a history of ADHD but was not receiving treatment or taking ADHD medication. (Tr. 19). However, Beerman stated that his medication improved his focus and that he would take the medication if he were still in school. (Tr. 19).

At step three, the ALJ concluded that Beerman did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 19). In determining whether Beerman had an impairment or combination of impairments that met the severity of one of the listed impairments, the ALJ considered Listing 1.04, spine disorders, and Listing 12.04, affective disorders. (Tr. 19). In finding that he did not meet Listing 12.04, the ALJ considered the Paragraph B criteria for mental impairments, which required at least two of the following:

> marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.

(Tr. 19). The ALJ defined a marked limitation as more than moderate but less than extreme and repeated, extended episodes of decompensation as three episodes within one year or once every four months with each episode lasting at least two weeks. (Tr. 19).

The ALJ found that Beerman had a mild restriction in daily living activities. (Tr. 19). He noted that Beerman had no issues with personal care and that he dressed appropriately with good hygiene at his psychological consultative examination. (Tr. 19). He indicated that Beerman enjoyed working on his car and training his dog. (Tr. 19). He stated that Beerman could cook simple meals, do laundry, drive, grocery shop, look for work, care for his dog, watch television, listen to music, and attend appointments. (Tr. 19).

The ALJ determined that Beerman had moderate difficulties in social functioning. (Tr. 20). He indicated that Beerman got along with family, friends, and authority figures unless he was in a bad mood, that Beerman lived with his mother, and that he spent time with his girlfriend. (Tr. 20). Despite Beerman's mother reporting that he visited friends, Beerman stated

that he preferred isolation.  (Tr. 20).  The examiner found that Beerman cooperated appropriately.  (Tr. 20).

The ALJ found that Beerman had moderate difficulties in concentration, persistence, and pace.  (Tr. 20).  Beerman stated that he could follow instructions and pay attention for an hour.  (Tr. 20).  Beerman's mother indicated that he had trouble with stress and changes in routine.  (Tr. 20).  During Beerman's psychological consultative examination, he completed simple math calculations, serial sevens, and serial threes accurately, his thought process was normal, and his immediate, recent, and remote memory was intact.  (Tr. 20).

The ALJ determined that Beerman experienced no extended episodes of decompensation.  (Tr. 20).  He noted that Beerman was hospitalized for suicidal thoughts in February 2011 but that it was not an extended duration.  (Tr. 20).  Based on the above, the ALJ concluded that Beerman did not satisfy the Paragraph B criteria.  (Tr. 20).  He also found that Beerman did not satisfy the Paragraph C criteria.  (Tr. 20).

The ALJ then assessed Beerman's residual functional capacity (RFC) as follows:

> the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) (i.e. lifting, carrying, pushing, and pulling up to 20 pounds occasionally and 10 pounds frequently; standing/walking, in combination, up to 6 of 8 hours in an eight-hour workday; and, sitting up to 6 of 8 hours in an eight-hour workday), further limited as follows:  occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; never climbing ladders, ropes, or scaffolds; and, no walking on uneven ground.  Mentally, he cannot understand, remember, or carry out complex job instructions but can perform detailed and simple repetitive tasks on a sustained basis (meaning eight hours a day for 5 days a week, or an equivalent work schedule); only occasional work in close proximity to others to minimize distractions; work at a flexible pace (where the employee is allowed some independence in determining either the timing of different work activities, or pace of work); only casual/superficial interactions with others, including supervisors, coworkers and the

general public; only occasional interactions with the general public; and, no exposure to intense or critical supervision.

(Tr. 20–21). The ALJ explained that in considering Beerman's symptoms he followed a two-step process. (Tr. 21). First, he determined whether there was an underlying medically determinable physical or mental impairment that was shown by a medically acceptable clinical and laboratory diagnostic technique that reasonably could be expected to produce Beerman's pain or other symptoms. (Tr. 21). Then, he evaluated the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limited Beerman's functioning. (Tr. 21).

Beerman testified that he was twenty-four years old, six feet tall, 235 pounds, right handed, single, and that he lived with his mother. (Tr. 21). He stated that he could drive, read, and write, and that he has a GED. (Tr. 21). He claimed that he injured his back in a car accident, which has caused ongoing back problems. (Tr. 21). He indicated that his back pain prevented any lifting, pushing, pulling, bending, or twisting and that he could not walk more than one mile. (Tr. 21). Beerman described his back pain as two or three out of ten but that his pain was ten out of ten when he exerted himself. (Tr. 21). He reported that he received a cortisone shot in his back that relieved his pain for a couple months. (Tr. 21). He indicated that he has degenerative disc disease, that he took Ultram, and that he did stretching exercises. (Tr. 21–22).

Beerman reported that he could stand for two to three hours of an eight-hour workday, that he could sit for four to five hours of an eight-hour workday, that he did not need a cane or walker, and that he could climb stairs. (Tr. 22). He indicated that he could not lift more than ten to fifteen pounds, could not bend his back, and that he could not grab with his left hand without experiencing pain. (Tr. 22). Beerman testified that he had bipolar disorder, which caused mood swings and destructive behavior. (Tr. 22). He indicated that he felt uneasy around others and in

public.  (Tr. 22).  Beerman went to Drs. Don Marshall and Anthony Flores for mental health treatment.  (Tr. 22).  He saw Dr. Flores, a psychologist, for counseling therapy once a month and saw Dr. Marshall, a psychiatrist, for psychotropic medications.  (Tr. 22).

Beerman testified that he was diagnosed with ADHD in 2009 and that he was not taking any medication.  (Tr. 22).  He indicated that his medication improved his concentration, focus, and mood swings but that he felt nervous constantly.  (Tr. 22).  He reported that he used marijuana weekly but had not used it in the past year.  (Tr. 23).  Beerman also stated that he cultivated marijuana previously.  (Tr. 23).  He stated that he did not use other drugs, but the ALJ indicated that reports from 2006 and 2007 showed otherwise.  (Tr. 23).

Beerman stated that he trained his dogs, took his girlfriend to work, completed household chores, and read.  (Tr. 23).  He indicated that he could dress and bath himself, go grocery shopping, and drive but that he could not cook, vacuum, or sweep the floor.  (Tr. 23).  He reported that he went to alcoholic anonymous meetings weekly and that he had no problems interacting with people at the meetings.  (Tr. 23).  Beerman testified that he had a few part time jobs for approximately one month each.  (Tr. 23).  He stated that he found work stressful because he was criticized, had to deal with the public, and his back pain limited his physical abilities. (Tr. 23–24).  Beerman indicated that he felt uncomfortable interacting with others and being in a group.  (Tr. 24).  He reported that he only could handle a group of four to five people but stated that there were as many as ten people at his AA meetings.  (Tr. 24).  He stated that he would leave if there were too many people present and that he would get upset for no reason.  (Tr. 24). Teresa Beerman, his mother, testified that she did not see him often and that he experienced mood swings.  (Tr. 24).  She stated that Beerman's medication and maturation had improved his temper and mood swings.  (Tr. 24).

The ALJ found that Beerman's impairments could cause his alleged symptoms but that he did not find Beerman credible regarding the intensity, persistence, and limiting effects of his symptoms. (Tr. 24). The ALJ noted that Beerman's history of drug dependency affected his alleged mental impairments. (Tr. 24). Despite Beerman's claim that he was not using drugs currently, the ALJ indicated that he was on probation for using and growing marijuana and that medical providers had terminated care for drug and behavioral issues. (Tr. 24). The ALJ found Beerman incredible because the record showed that Beerman volunteered at an animal rescue shelter, but Beerman denied doing that work. (Tr. 24). He also indicated that Beerman and his mother stated that disability benefits would pay his living expenses, but they did not indicate a desire for better treatment to improve Beerman's conditions. (Tr. 24).

The ALJ stated that mental examinations, physical examinations, and objective tests did not corroborate Beerman's allegations. (Tr. 24). He noted that Beerman received only conservative treatment for his back pain, that counseling improved his psychological symptoms, and that medication improved his mood swings. (Tr. 24–25). At the hearing, the ALJ found that Beerman did not exhibit any physical pain behaviors. (Tr. 25). For example, he noted that Beerman walked normally, did not squirm in his seat, did not stand, responded to questions well, was pleasant, and had no anxiety or nervous problems. (Tr. 25). However, the ALJ stated that Beerman avoided eye contact and testified that he felt anxious and nervous in groups. (Tr. 25).

The ALJ then discussed Beerman's alleged back problems. (Tr. 25–26). He noted that Beerman received treatment for low back pain that radiated into his right leg. (Tr. 25). Beerman's physical examinations demonstrated normal gait, normal leg motor and sensation, normal reflexes, no atrophy, and 5/5 muscle strength and tone. (Tr. 25). However, Beerman had limited lumbar spine movement, back tenderness, and a few positive straight leg raise findings.

(Tr. 25).  On two occasions, Dr. Jon Karl refused to prescribe narcotics based on Beerman's substance abuse history but prescribed pain medication and physical therapy.  (Tr. 25–26).  Upon learning that he would not receive narcotics, Beerman angrily left the office without receiving his other prescriptions or performing a physical examination.  (Tr. 25–26).

Dr. Matthew Barb, Beerman's primary care doctor, treated him for back and leg pain between August 2012 and October 2012.  (Tr. 26).  In September 2012, after Beerman's first visit, Dr. Barb restricted Beerman from work that required lifting more than ten pounds, bending, or twisting.  (Tr. 26).  Additionally, Dr. Barb indicated that the restrictions were indefinite and long-term based on Beerman's chronic back pain.  (Tr. 26).  Despite Beerman's back pain, the ALJ found that the record did not establish debilitating functional limitations because physical examinations revealed few abnormalities.  (Tr. 26).  Although Beerman had back tenderness, limited spine movement, and a positive straight leg raise at times, the ALJ indicated that he had a normal gait without sensory deficits, weakness, or atrophy and no issues using his hands.  (Tr. 26).

The ALJ gave little weight to Dr. Barb's ten-pound lifting restriction.  (Tr. 26).  He indicated that Beerman had not seen Dr. Barb since September 2008 or 2009 before seeing him in August and September 2012.  (Tr. 26).  He found that Dr. Barb relied heavily on Beerman's subjective complaints, that Dr. Barb did not explain his conclusion, and that Dr. Barb's report did not identify what objective abnormalities were expected for a disabling back impairment.  (Tr. 26–27).  The ALJ also found Dr. Barb's opinion unpersuasive because it conflicted with the record.  (Tr. 27).  State agency physicians found that Beerman could perform restricted, light work.  (Tr. 27).  The ALJ agreed with that opinion and the physicians' physical assessment.  (Tr.

27).  However, the ALJ included additional limitations, including no climbing of ladders, ropes, or scaffolds and no walking on uneven ground.  (Tr. 27).

The ALJ then reviewed Beerman's mental impairments.  (Tr. 27).  He noted that Beerman had a history of bipolar disorder, ADHD, and panic attacks.  (Tr. 27).  Beerman was hospitalized for five days in February 2011 and diagnosed with mood disorder, polysubstance dependence, borderline personality disorder, and possible drug-induced mood disorder.  (Tr. 27).  Beerman reported that he stopped using psychotropic medication but was using drugs, including opiates and morphine.  (Tr. 27).  The psychiatrist, Dr. Patel, indicated that Beerman lied about his drug use and that he gave excuses for his positive drug test.  (Tr. 27).  Dr. Patel terminated his services upon discharge because of Beerman's noncompliance and dishonesty.  (Tr. 27).

In 2011, psychiatrist, Dr. Don Marshall, treated Beerman for depression.  (Tr. 27).  Beerman's medication improved his mood throughout the year, but he still experienced anger, restless sleep, and felt down in September 2011.  (Tr. 27).  During treatment, Beerman stated that he wanted to go to college to learn to cultivate marijuana and to start a new business.  (Tr. 27).  The ALJ indicated that WE CARE Counseling Center's records noted cannabis dependence and bipolar disorder.  (Tr. 27).  Beerman reported that he had a girlfriend, who he met through a drug dealer, that he wanted to get a job, and that he quit taking medications because they stopped working.  (Tr. 27).  He also stated that probation made him attend therapy and that he applied for disability benefits to assist with living expenses.  (Tr. 27–28).

In November 2011, Beerman underwent an independent psychological examination where he reported mood swings, frustration, anger, and irritability.  (Tr. 28).  He also reported depression, that his medication did not control his mood effectively, and substance abuse.  (Tr. 28).  The mental status examination demonstrated adequate memory, normal speech and thought

process, depressed mood, flat affect, and an ability to perform simple math calculations. (Tr. 28). The examiner, Dr. Amanda Mayle, diagnosed Beerman with bipolar disorder and cannabis dependence and found a GAF score of 49. (Tr. 28). However, she did not give an opinion on Beerman's mental functional ability. (Tr. 28).

The ALJ gave Dr. Mayle's finding of a GAF score of 49 little weight. (Tr. 28). He indicated that Dr. Mayle's GAF score factored in Beerman's stressors, such as chemical dependency and probation, but that those stressors did not explain Beerman's actual functional limitations. (Tr. 28). Therefore, the ALJ concluded that Dr. Mayle's GAF assessment did not translate into extreme or marked limitations. (Tr. 28). He further stated that Dr. Mayle's GAF assessment provided a snapshot into Beerman's condition, but that her clinical findings, which found an adequate memory and normal thought process, were a more reliable indicator of Beerman's functioning. (Tr. 28).

The ALJ noted that Beerman began substance abuse treatment in March 2012 with Dr. Marshall. (Tr. 28). Beerman had been smoking spice and was experiencing withdrawal symptoms. (Tr. 28). In August 2012, he reported problems with anxiety and panic attacks and was on home detention. (Tr. 28). In October 2012, Beerman sought medication to control his anxiety and indicated that Klonopin and marijuana were the only things that helped his anxiety. (Tr. 29). Dr. Marshall refused to prescribe Klonopin, an addictive medication, and he found Beerman cooperative and his mood dysthymic with a restricted affect. (Tr. 29). In February 2013, Beerman stated that he was doing okay, he was assessed as stable, and there was no evidence of psychosis or significant mood disturbance. (Tr. 29).

Beerman alleged that he could not work due to an inability to sustain attention and concentration, an inability to work with others, and an inability to handle criticism. (Tr. 29).

The ALJ concluded that the RFC accounted for each limitation. (Tr. 29). The ALJ noted that Beerman was better able to handle his temper and anger problems, that his memory was adequate, that he could sustain concentration to perform simple math calculations, and that he interacted with friends and family regularly. (Tr. 29). He also stated that Beerman did not report problems getting along with others, that his mood improved with treatment, and that he reported he was okay at his last mental health session. (Tr. 29).

Dr. Anthony Flores treated Beerman for bipolar disorder and ADHD for over three years. (Tr. 29). He found mood instability, restlessness, diminished attention and concentration, racing thoughts, and trouble sleeping. (Tr. 29). He concluded that Beerman met a listing with marked functional limitations and more than four repeated episodes of decompensation. (Tr. 29). He also concluded that Beerman would miss more than four workdays per month. (Tr. 29).

The ALJ gave little weight to Dr. Flores's opinion. (Tr. 29). He indicated that Beerman stopped using drugs recently and that his drug dependency had exacerbated his psychological symptoms in the past. (Tr. 29). The ALJ stated that Dr. Flores's records did not support the severity of Beerman's alleged mental impairments. (Tr. 29). He determined that the other evidence demonstrated some social and concentration deficits but that it was inconsistent with disabling mental impairments. (Tr. 29). The ALJ further stated that Beerman volunteered at an animal rescue shelter and wanted to get a job, but waited for disability benefits for financial reasons. (Tr. 29).

State agency psychologists concluded that Beerman could understand, remember, and follow simple to mildly complex instructions and that he could sustain attention and concentration to perform tasks with reasonable pace and persistence. (Tr. 29). However, they did limit him to brief, superficial interactions with co-workers, supervisors, and the public. (Tr.

29). The ALJ gave the State agency psychologists' opinions significant weight because they were consistent with the record. (Tr. 29). He also stated that he included RFC limitations consistent with the State agency's assessment. (Tr. 29).

At step four, the ALJ found that Beerman had no past relevant work. (Tr. 30). Considering his age, education, work experience, and RFC, the ALJ concluded that there were jobs in the national economy that Beerman could perform, including housekeeper/cleaner (3,490 jobs in Indiana and 265,104 jobs nationally), stocker (1,850 jobs in Indiana and 89,110 jobs nationally), and mail clerk (1,230 jobs in Indiana and 89,950 jobs nationally).

## Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014); *Bates v. Colvin*, 736 F.3d 1093, 1097 (7th Cir. 2013) ("We will uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported her decision with substantial evidence."); *Pepper v. Colvin*, 712 F.3d 351, 361–62 (7th Cir. 2013); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 852 (1972) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 2d 140 (1938)); *see Bates*, 736 F.3d at 1098; *Pepper*, 712 F.3d at 361–62; *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's

decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); *Rice v. Barnhart*, 384 F.3d 363, 368–69 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

Supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. § 423(d)(1)(A)**. The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. **20 C.F.R. § 416.920**. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." **20 C.F.R. § 416.920(b)**. If he is, the claimant is not disabled and the evaluation process is over. If he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities." **20 C.F.R. § 416.920(c)**; *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (discussing that the ALJ must consider the combined effects of the claimant's impairments). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. **20 C.F.R. § 401, pt. 404, subpt. P, app. 1**. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of his

past work.  If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled.  **20 C.F.R. § 416.920(e)**.  However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience, and functional capacity to work, is capable of performing other work and that such work exists in the national economy.  **42 U.S.C. § 423(d)(2); 20 C.F.R. § 416.920(f)**.

First, Beerman has argued that the ALJ evaluated his drug and alcohol addiction improperly.  "Congress eliminated alcoholism or drug addiction as a basis for obtaining social security benefits."  ***Harlin v. Astrue***, 424 F. App'x 564, 567 (7th Cir. 2011).  The Commissioner shall not find a claimant disabled if alcoholism or drug addiction would be a material factor in the disability determination.  **42 U.S.C. § 1382c(a)(3)(J); 20 C.F.R. § 416.935**.  Therefore, the ALJ must determine whether the claimant would still be disabled if he did not abuse any substances.  ***Harlin***, 424 F. App'x at 567 (citations omitted).  First, the ALJ must determine whether the claimant is disabled.  ***Mikolajczyk v. Colvin***, 2013 WL 5460156, at *11 (N.D. Ind. Sept. 30, 2013).  If the ALJ finds the claimant disabled, then he must determine whether there is medical evidence of alcoholism or drug addiction.  ***Mikolajczyk***, 2013 WL 5460156 at *11.  If the ALJ finds evidence of alcoholism or drug addiction, then he must determine whether it was a material factor in the disability finding, in other words, whether the claimant would remain disabled if he stopped using alcohol or drugs.  ***Mikolajczyk***, 2013 WL 5460156 at *11.

Beerman has claimed that the ALJ's opinion was inconsistent regarding his drug and alcohol addiction (DAA) because he found Beerman's DAA non-severe and that it touched every aspect of this case.  Beerman has argued that the ALJ erred by rejecting his claims based on his DAA, rather than considering his DAA in connection with his mental impairments.  The

Commissioner has argued that the ALJ used Beerman's DAA correctly by showing the inconsistences in Beerman's testimony. She has stated that the ALJ relied on Beerman's DAA to support his credibility finding, rather than relying on it to dispute Beerman's alleged mental impairments.

The ALJ followed the DAA evaluation process properly. The ALJ found that Beerman was not disabled after considering all his impairments, including DAA. Because of that conclusion, the ALJ did not need to determine whether Beerman's DAA was material. *See Mikolajczyk*, 2013 WL 5460156 at *11; **SSR 13-2P (S.S.A. Feb. 20, 2013)**. Moreover, the ALJ did not find Beerman incredible because of his DAA as Beerman has claimed. Rather, the ALJ identified inconsistencies within Beerman's testimony regarding his DAA to find him incredible. For example, the ALJ indicated that Beerman said he had only used marijuana, despite records showing that he used crack in 2006 and 2007. (Tr. 18, 23). The ALJ noted that Beerman denied using any drugs to Dr. Patel, but Dr. Patel's drug screen was positive for opiates and marijuana. (Tr. 27). The ALJ described how Beerman sought treatment for low back pain in 2011 and 2012, but he left the office angrily each time when the doctors refused to prescribe narcotics. (Tr. 25–26). The above examples demonstrate that the ALJ did not presume that Beerman was incredible because of his DAA. Rather, the ALJ found him incredible based on specific instances of dishonesty or unusual behavior.

Beerman also has argued that the ALJ rejected the medical evidence based on his DAA because the ALJ summarized the DAA evidence and stated, "everything seems to be filtered through the fact that he had a history of drug dependency, primarily marijuana dependency." (Tr. 24). However, the ALJ did not rely on the DAA evidence to reject Beerman's claims or any supporting medical evidence. The ALJ indicated that Beerman alleged he could not work

because he could not sustain attention and concentration, could not work with others, and could not handle criticism from a supervisor.  (Tr. 29).  The ALJ stated that the evidence did not support those claims because the RFC supported any limitations adequately.  (Tr. 29).  In support, the ALJ listed Beerman's testimony that he could handle his temper and anger problems.  (Tr. 29).  The ALJ summarized Beerman's psychological consultative examination, where his memory was adequate and he could concentrate sufficiently to complete serial threes, serial sevens, and simple math calculations.  (Tr. 29).  The ALJ noted that Beerman interacted with friends, his girlfriend, and his mother and that Beerman did not report any issues getting along with others.  (Tr. 29).  Finally, the ALJ stated that Beerman's last mental health session showed an improved mood and that Beerman said he was okay.  (Tr. 29).  The above reasons demonstrated that the ALJ did not rely improperly on Beerman's DAA to reject his claim of disabling mental impairments, but that he relied on other, contradicting medical evidence in the record.

Next, Beerman has argued that the ALJ rejected his treating psychiatrist and physician erroneously.  A treating source's opinion is entitled to controlling weight if the "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  **20 C.F.R. § 404.1527(d)(2)**; *see Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).  The ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability."  *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992)); *see* **20**

C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

"'[O]nce well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight' and becomes just one more piece of evidence for the ALJ to consider." *Bates*, 736 F.3d at 1100. Controlling weight need not be given when a physician's opinions are inconsistent with his treatment notes or are contradicted by substantial evidence in the record, including the claimant's own testimony. *Schmidt*, 496 F.3d at 842 ("An ALJ thus may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability."); *see, e.g.*, *Latkowski v. Barnhart*, 93 Fed. App'x 963, 970–71 (7th Cir. 2004); *Jacoby v. Barnhart*, 93 Fed. App'x 939, 942 (7th Cir. 2004). If the ALJ was unable to discern the basis for the treating physician's determination, the ALJ must solicit additional information. *Moore v. Colvin*, 743 F.3d 1118, 1127 (7th Cir. 2014) (citing *Similia v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009)). Ultimately, the weight accorded a treating physician's opinion must balance all the circumstances, with recognition that, while a treating physician "has spent more time with the claimant," the treating physician may also "bend over backwards to assist a patient in obtaining benefits . . . [and] is often not a specialist in the patient's ailments, as the other physicians who give evidence in a disability case usually are." *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006) (internal citations omitted); *see Punzio*, 630 F.3d at 713.

Beerman has argued that the ALJ rejected Dr. Flores's opinion that he met a listing improperly. He has claimed that the ALJ relied on his DAA improperly, that the medical evidence supported Dr. Flores's opinion, and that his brief volunteer work did not discredit Dr.

Flores's opinion. Beerman also has stated that the ALJ failed to explain why he accepted the non-examining psychologists' opinions over Dr. Flores's opinion. He has argued that the non-examining psychologists based their opinions on an incomplete record, so they should not receive greater weight than Dr. Flores's opinion. The Commissioner has indicated that the ALJ gave four reasons for rejecting Dr. Flores's opinion. Therefore, she has argued that the ALJ minimally articulated his reasoning for rejecting Dr. Flores's opinion.

Dr. Flores treated Beerman for bipolar disorder and ADHD once a month for over three years. (Tr. 29). He indicated that Beerman only could perform certain mental abilities between 20% and 40% of a normal workday and workweek and that Beerman would find many work demands stressful. (Tr. 575–76). Dr. Flores concluded that Beerman had marked limitations in daily living activities, social functioning, and concentration, persistence, and pace and four or more repeated, extended episodes of decompensation. (Tr. 577). He also concluded that Beerman would miss at least four workdays per month. (Tr. 578).

The ALJ provided four reasons for giving Dr. Flores's opinion little weight. (Tr. 29). He indicated that Beerman's history of drug dependency seemed to exacerbate his psychological symptoms but that he had stopped using drugs recently, that Dr. Flores's records did not support the severity of Beerman's allegations, that the other mental health evidence was inconsistent with Dr. Flores's conclusions, and that Beerman was waiting for disability benefits for financial reasons, despite reporting that he volunteered at an animal shelter and wanted to work. (Tr. 29). The ALJ minimally articulated his reasoning for not giving Dr. Flores's opinion controlling weight.

The ALJ stated that Dr. Flores's records did not support the severity of Beerman's claims. For example, the ALJ noted Dr. Flores's February 2013 records that showed no evidence

of psychosis or significant mood disturbance and that assessed Beerman as stable. (Tr. 29). He also stated that Beerman reported that he was okay at that time. (Tr. 29). Additionally, the ALJ indicated that Beerman's mood improved throughout his treatment with Dr. Flores. (Tr. 29). The ALJ minimally articulated how Dr. Flores's treatment records did not support a disabling mental impairment.

The ALJ also minimally articulated how the other mental health evidence was inconsistent with Dr. Flores's opinion. The ALJ indicated that Beerman underwent a psychological consultative examination that found that Beerman could complete simple math calculations and that his memory was adequate. (Tr. 28). The ALJ explained that the record supported a mild restriction in daily living activities and moderate restrictions in social functioning and concentration, persistence, and pace, as opposed to Dr. Flores's marked limitation findings. (Tr. 19–20). Moreover, the ALJ stated that Beerman had not experienced any extended episodes of decompensation. (Tr. 20).

Based on the above, the ALJ minimally articulated his reasons for rejecting Dr. Flores's opinion. He explained how Dr. Flores's records were inconsistent with Beerman's claims and how a consulting physician's opinion was inconsistent with Dr. Flores's opinion. *See **Schmidt***, 496 F.3d at 842. The ALJ also discredited Dr. Flores's opinion by indicating that Beerman volunteered at an animal shelter. (Tr. 29). The ALJ cited and the record indicated that Beerman volunteered at the animal shelter in his spare time and that he wanted to get a job. (Tr. 348, 368). Although Beerman has argued that his volunteer work was court ordered and not ongoing, the ALJ could have found the above information inconsistent with Dr. Flores's conclusions. It is not clear why Beerman's history of drug dependency or recent sobriety discredited Dr. Flores's opinion. However, any error was harmless because the ALJ minimally articulated other reasons

to discount his opinion.  *See **Simila v. Astrue***, 573 F.3d 503, 516 (7th Cir. 2009) ("[A]ny error here was harmless given the other reasons the ALJ cited for discounting Dr. Caillier's opinions.").

Next, Beerman has argued that the ALJ rejected Dr. Barb's opinion erroneously.  Dr. Barb imposed a ten-pound lifting restriction on Beerman due to back pain.  (Tr. 582).  The ALJ gave Dr. Barb's opinion little weight because he only saw Beerman twice before imposing work restrictions, he relied heavily on Beerman's subjective claims, the opinion was conclusory with little explanation, his records did not include objective findings, and the opinion was inconsistent with other medical evidence.  (Tr. 26–27).  Rather, than attacking the ALJ's reasoning for rejecting Dr. Barb's opinion, Beerman has attacked the non-examining physicians' opinions that conflicted with Dr. Barb's opinion.

The ALJ minimally articulated his reasons for rejecting Dr. Barb's opinion.  His reasons reflect the regulatory factors that the Commissioner should consider.  *See* **20 C.F.R. § 416.927(c)**.  For example, he indicated that Dr. Barb only treated Beerman a few times, that his opinion was conclusory and without objective findings or supporting evidence, and that his opinion was inconsistent with the record.  Additionally, the ALJ cited evidence that Beerman had a normal gait without sensory deficits, weakness, or atrophy.  (Tr. 26).  Moreover, Dr. Barb's explanation was simply "Dx:  Chronic Back Pain."  (Tr. 581).  The ALJ provided good reasons to reject Dr. Barb's opinion.

Finally, Beerman has argued that the ALJ did not support his RFC finding with substantial evidence.  SSR 96-8p explains how an ALJ should assess a claimant's RFC at steps four and five of the sequential evaluation.  In a section entitled, "Narrative Discussion

Requirements," SSR 96-8p specifically spells out what is needed in the ALJ's RFC analysis. This section of the Ruling provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p (footnote omitted). Thus, as explained in this section of the Ruling, there is a difference between what the ALJ must contemplate and what he must articulate in his written decision. "The ALJ is not required to address every piece of evidence or testimony presented, but he must provide a 'logical bridge' between the evidence and his conclusions." *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). Although the ALJ does not need to discuss every piece of evidence, he cannot ignore evidence that undermines his ultimate conclusions. *Moore*, 743 F.3d at 1123 ("The ALJ must confront the evidence that does not support her conclusion and explain why that evidence was rejected.") (citations omitted). "A decision that lacks adequate discussion of the issues will be remanded." *Moore*, 743 F.3d at 1121.

Beerman has argued that the ALJ failed to support his RFC because he did not explain why he credited the state agency psychologists and physicians over his treating physicians. As discussed above, the ALJ not only minimally articulated his reasons, but provided good reasons, for rejecting the treating physicians. However, the ALJ supported his RFC finding with substantial evidence. Regarding Beerman's back limitations, the ALJ indicated that Beerman's

gait was normal, that he had no sensory deficits, weakness, or atrophy, and that he had few back abnormalities. (Tr. 26). Additionally, the ALJ noted that the state agency physicians found that Beerman's back pain did not preclude light work. (Tr. 27). Despite Beerman's claim, the state agency physicians reviewed his medical records and provided a greater explanation than Dr. Barb. (Tr. 355).

Similarly, the ALJ built a logical bridge from the evidence to his mental limitation findings. As discussed above, the ALJ explained why he rejected Dr. Flores's opinion. He also reviewed the state agency psychologists' opinions, which concluded that Beerman could understand instructions and sustain attention and concentration. (Tr. 29). Additionally, the ALJ noted that Beerman could perform simple math calculations, interacted with his friends and family on a regular basis, and that he did not report problems getting along with others. (Tr. 29). The ALJ further indicated that Beerman's mood improved with treatment. (Tr. 29).

Beerman also has claimed that the ALJ did not address his episodes of anger and frustration. However, the ALJ discussed Beerman's mental and emotional conditions, including his outbursts and temper problems. (Tr. 22). Therefore, it is clear that the ALJ contemplated Beerman's anger issues. Additionally, the ALJ reviewed Beerman's treatment records that showed no evidence of psychosis or significant mood disturbance and assessed him as stable. (Tr. 29). The ALJ also noted that Beerman reported that he could better handle his temper and anger problems. (Tr. 29). Therefore, the ALJ adequately discussed Beerman's episodes of anger and frustration and supported his RFC finding with substantial evidence.

Based on the foregoing reasons, the decision of the Commissioner is **AFFIRMED**.

ENTERED this 11th day of March, 2016.

/s/ Andrew P. Rodovich
United States Magistrate Judge